FILED

2018 JAN 17  PH 4: 19

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

MIDDLE DISTRICT OF FLORIDA
ORLANDO, FLORIDA

| | | |
|---|---|---|
| DONALD A. PETERSON and LORI HILDMEYER, | ) ) | Civil Action No. 6:18-CV-84-ORL-31-DCI |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| PNC Bank, N.A., | ) | |
| | ) | |
| Defendant. | ) | |

**COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiffs, Donald A. Peterson and Lori Hildmeyer, husband and wife, (collectively the "Petersons") allege violations of the Florida Consumer Collection Practices Act § 559.55 *et seq.* ("FCCPA"), and the Real Estate Settlement Procedures Act § 2601 *et seq.* ("RESPA") against PNC Bank, N.A. ("PNC"). The Petersons also allege common law libel, intentional infliction of emotional distress, and wrongful foreclosure against PNC.

**INTRODUCTION**

1.      The Petersons have never fallen behind on their mortgage obligations, but since 2008, National City sued the Petersons seeking foreclosure on their home, and PNC sued the Petersons seeking foreclosure on their home, which the second lawsuit is still pending. This lawsuit seeks to hold PNC accountable for its arrogant disregard of the Petersons' rights, and its violations of federal and state consumer protection law.

**JURISDICTION AND VENUE**

2.     The Court has subject matter jurisdiction under 28 U.S.C. § 1331 because this action arises out of RESPA, a federal statute.

3.     The Court has supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367 because the basis of the federal claim involves the same illegal practices that support the state claims.

4.     The Court has personal jurisdiction because PNC does business throughout the United States, including Florida. Further, its voluntary contact with Plaintiff to charge debts in Florida made it foreseeable that PNC would be haled into a Florida court. *See Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474 (1985).

5.     Venue is proper in this District under 28 U.S.C. §§ 1391(b)-(c) because PNC is deemed to reside in any judicial district in which it is subject to personal jurisdiction when the action is commenced and because PNC's contacts with this District are sufficient to subject it to personal jurisdiction.

**PARTIES**

6.     Donald A. Peterson and Lori Hildmeyer are natural persons residing in Seminole County, Florida.

7.     PNC is a national association with its headquarters at 249 Fifth Avenue One PNC Plaza Pittsburgh, PA 15222.

## FACTUAL ALLEGATIONS

**I.     NATIONAL CITY WRONGFULLY FORECLOSED ON THE PETERSONS' HOME.**

8.     On or about June 8, 2007, the Petersons took out a mortgage on their home at 3585 Canal St. Oviedo, Florida 32765, secured by a $139,500 note (collectively "Mortgage") with National City Mortgage a Division of National City Bank ("National City").

9.     Only Lori Hildmeyer is liable under the note.

10.     Fannie Mae owns the Mortgage and PNC is the servicer on behalf of its principal Fannie Mae.

11.     In early 2008, the Petersons received harassing phone calls from National City claiming they were delinquent on their mortgage payments.

12.     During the next several months, the Petersons called National City dozens of times disputing the delinquency because they had never missed a mortgage payment.

13.     National City ignored the Petersons, and on or about August 1, 2008, National City's internal records show it approved initiated foreclosure proceedings.

14.     Three days later, National City allegedly halted the foreclosure because the Petersons provided bank statements showing they made and National City accepted their mortgage payments.

15.     Internal communications indicate that National City attempted to place a foreclosure hold on the Petersons' Mortgage, but National City still hired the Law Offices of David J. Stern, P.A. who foreclosed on the Petersons' home.

3

16.     Notably, the Law Offices of David J. Stern, P.A. was the subject of numerous lawsuits and attorney general investigations for illegal conduct involving its "foreclosure mill" law firm.

17.     On or about October 24, 2008, PNC acquired National City Bank and the Mortgage.

18.     On or about December 1, 2008, the Law Offices of David J. Stern, P.A., on behalf of PNC, filed a complaint for foreclosure against the Petersons. *National City Mortgage, A Division of National City Bank v. Donald A. Peterson et al.*, Case No.: 2008CA007760

19.     In the complaint, National City alleged the Petersons were seven months behind on their mortgage payments.

20.     After the Petersons filed an answer, National City soon discovered that it had misapplied the Petersons' mortgage payments to another account.

21.     On or about January 9, 2009, National City dismissed the foreclosure lawsuit after the Petersons agreed to "reinstate" the Mortgage, despite never defaulting on their payments.

22.     The Petersons "reinstated" the Mortgage because they were terrified PNC would illegally take possession of their home.

## II.     PNC WRONGFULLY FORECLOSED ON THE PETERSONS' HOME.

23.     Even though the foreclosure was dismissed, on January 12, 2009, PNC continued to harass the Petersons by calling them multiple times per day, and falsely asserting they were delinquent on the Mortgage.

24.     The Petersons were not delinquent because they physically delivered their mortgage payments on a timely basis to the local PNC branch.

25.     PNC even forced Mr. Peterson to pay ahead when it called Mr. Peterson demanding immediate payment despite the Mortgage being current.

26.     In April 2010, PNC force-placed hazard insurance on the Petersons' home.

27.     PNC had no right to charge the Petersons for force-placed insurance because they had sufficient homeowner's insurance coverage.

28.     PNC also created a force-placed escrow account for the Mortgage where the alleged force-placed hazard insurance premiums were paid from.

29.     In May 2010, PNC unilaterally increased the Petersons' monthly payment to account for escrowing the unreasonable and inflated force-placed hazard insurance premium and taxes.

30.     For months, the Petersons continued to pay their regular monthly payment, which PNC continued to accept.

31.     The Petersons also continued to pay taxes and insurance themselves, as they always did, because their mortgage account was a non-escrow account.

32.     Unknown to them, PNC considered their monthly payments "short", and because they were short, PNC claimed the Petersons had defaulted on the Mortgage.

33.     Once it placed them in "default", PNC placed the payments into suspense and paid itself for default-related fees, late charges, and property inspections, applying no amount to principle or interest.

34.     PNC's conduct is specifically prohibited by the Mortgage, which requires PNC to apply payments as follows: "interest due under the Note; principal due under the Note; and amounts due under Section 3."

35.     On or about August 22, 2010, the Petersons' representative, Don Brown, contacted PNC and disputed PNC's improper accounting.

36.     PNC advised Mr. Brown it was applying the Petersons' payments to default-related fees, late charges, and property inspections.

37.     On August 28, 2010, Mr. Peterson contacted PNC and disputed the alleged default, the force-placed hazard insurance, and PNC's force-placed escrow account.

38.     After speaking with Mr. Peterson, PNC realized its error in creating a force-placed escrow account because it sent the Petersons a letter apologizing.

39.     Shortly thereafter, the Petersons also provided PNC with proof of homeowner's insurance.

40.     However, PNC never corrected the Petersons' mortgage account to reflect this change because PNC still demanded immediate payment of the $346.11 related to the force-placed insurance.

41.     According to the Mortgage, PNC had two options to collect the "alleged" $346.11: (i) either allow the shortage to exist; or (ii) separately bill the Petersons but "in no more than 12 monthly payments."

42.     No matter what, PNC had no right to place the Petersons' timely and sufficient mortgage payments in suspense or declare the Mortgage in default.

6

43.     However, PNC ignored its obligations under the Mortgage and continued to consider the Petersons' mortgage payments insufficient, placing them in suspense.

44.     For the almost a year, PNC continued to misapply the Petersons' mortgage payments.

45.     As a result, on September 1, 2011, Albertelli Law, on behalf of PNC, filed a "Verified Mortgage Foreclosure Complaint" ("Verified Complaint") against the Petersons seeking to foreclose on their home. *PNC Bank, National Association, Successor by Merger to National City Mortgage, a Division of National City Bank v. Lori Hildmeyer and Donald Peterson et al.*, Case No. 11CA-3571-14-W.

46.     On October 25, 2011, a PNC employee, "E COLON", from the Petersons' local branch contacted PNC asking about the payment issues.

47.     Despite the payments being the correct payment amount, PNC advised Ms. Colon that the checks were placed into suspense because they were "insufficient."

48.     On November 10, 2011, E COLON again contacted PNC on behalf of the Petersons asking about the payment issues.

49.     In response, PNC's internal records indicate that a "hold" was placed on the foreclosure because of PNC's accounting errors.

50.     Despite the foreclosure hold, on December 7, 2011, Mrs. Hildmeyer answered a knock at the door, and a process server handed her a summons and copy of the "Verified Complaint" filed by Albertelli Law on behalf of PNC.

51.     The Verified Complaint alleged the Petersons' were in default for failure to pay their August 1, 2010, mortgage payment, and every payment after.

52. The allegations in the Verified Complaint were untrue because the Petersons timely paid the August 1, 2010, mortgage payment, and every payment thereafter.

53. The Verified Complaint demanded payment of $134,865.86.

54. On page three, the Verified Complaint provides:

### FLA. R. CIV. P. 1.110(b) VERIFICATION

Under penalty of perjury, I declare that I have read the foregoing, and the facts alleged therein are true and correct to the best of my knowledge and belief.

55. The Verified Complaint is signed by Claire Brueck, Esq. from Albertelli Law, and Jacqueline Casey from PNC.

56. After the foreclosure was placed in the public record, strangers arrived at the Petersons home like vultures on road kill. The Petersons felt trapped inside their own home.

57. To fight the foreclosure, the Petersons had no choice but to retain the Smothers Law Firm, P.A. ("Smothers").

58. The Petersons paid Smothers a monthly retainer fee to defend the foreclosure.

59. On January 13, 2012, Smothers filed an Answer and Affirmative Defenses to PNC's Complaint.

60. The Second Affirmative Defense states:

Plaintiff alleges that the Defendants defaulted on the Note and Mortgage as a result of non-payment of the September 1, 2010 installment. However, the Defendants tendered payment on September 1, 2010, and they have made subsequent payments which have been accepted by the Plaintiff or by Plaintiff's predecessor in interest. Therefore, Plaintiff was incorrect in alleging that the Note and Mortgage are in default.

8

61. On May 7, 2012, Albertelli Law, on behalf of PNC, filed a reply to the Answer and Affirmative Defenses denying all allegations.

62. From January 2012 until September 2012, Smothers constantly communicated with Albertelli Law explaining that the Petersons had never missed a payment, and the foreclosure lawsuit was in error.

63. Smothers repeatedly told Albertelli Law that PNC had no right to foreclose on the Petersons' home.

64. PNC ignored Smothers and continued its harassment of the Petersons by calling several times a day and proceeding with the illegal foreclosure litigation.

65. Finally, after Albertelli Law and PNC litigated the illegal foreclosure claim for more than a year, they agreed that the foreclosure was wrongfully filed.

66. On February 11, 2013, over a year after the foreclosure was filed, Albertelli Law finally filed a Notice of Voluntary Dismissal and Release of Lis Pendens.

67. The Notice states: **This case is being dismissed due to being Referred to Foreclosure in Error…"** (emphasis added.)

68. The Petersons thought their nightmare was over. They were wrong.

## III. PNC WORNGFULLY FORECLOSED ON THE PETERSONS' HOME A SECOND TIME.

69. Smothers filed a motion on February 13, 2013, for attorney's fees and costs due to PNC's wrongful foreclosure lawsuit, which the Court granted on July 1, 2013.

70.     However, internal records reflect that PNC never fixed its accounting errors and continued to show the Petersons' Mortgage in default, even though Smothers communicated with Albertelli Law on numerous occasions to ensure PNC would fix its internal errors.

71.     At first, PNC accepted the Petersons' mortgage payments, which apparently were placed in suspense again, but eventually it refused to accept the Petersons' mortgage payment.

72.     Over the next year, PNC continued to harass the Petersons claiming the Mortgage was in default.

73.     Shortly before March 3, 2014, PNC again hired Albertelli Law to file a lawsuit seeking foreclosure of the Petersons' home.

74.     PNC knew it had no legal right to foreclose on the Petersons' home because it had dismissed its previous illegal lawsuit, admitting it was wrongfully filed.

75.     PNC and Albertelli Law worked jointly and in concert to again illegally foreclose on the Petersons' home.

76.     On or about March 3, 2014, Albertelli Law, on behalf of PNC, filed another "Verified Mortgage Foreclosure Complaint" against the Petersons seeking to foreclose on their home, which is currently pending. *PNC Bank, National Association, v. Lori Hildmeyer and Donald A. Peterson et al.,* Case No. 59-2014-CA-000557.

77.     The Petersons again were forced to hire Smothers to defend the foreclosure.

78.     The 2nd Verified Complaint alleges the Petersons failed to make their mortgage payment on March 1, 2011, and no later payments had been made.

79.     On June 27, 2014, Smothers filed an Answer and Affirmative Defenses.

80.    The second affirmative defense states:

Plaintiffs claim in the Complaint that Defendants failed to tender an installation payment on March 1, 2011, and failed to submit all subsequent installation payments required under the subject Note and Mortgage. However, Defendants in fact did submit timely payment on March 1, 2011, and continued to submit subsequent monthly installation payments for several Plaintiffs claim in the Complaint that Defendants failed to tender an installation payment on March 1, 2011, and failed to submit all subsequent installation payments required under the subject Note and Mortgage. However, Defendants in fact did submit timely payment on March 1, 2011, and continued to submit subsequent monthly installation payments for several months thereafter. See **EXHIBITS A — H.** Due to Plaintiff's own fault and error, these payments were never appropriately credited to Defendants account in the Plaintiff's internal databases.

Plaintiff accepted the above payments. Then after previously filing an earlier foreclosure action in September 2011, Plaintiff attempted to return two payments to Defendants in hopes to Default the Defendants in that action. Plaintiff then stopped payment on the checks sent back to Defendants in October 2011. See **EXHIBIT I.** These amounts were never appropriately credited to Defendants' account with the bank or, alternatively, returned to the Defendants.

81.    Instead of investigating the allegations in the second affirmative defense, PNC moved to strike them forcing Smothers to file an Amended Answer and Affirmative Defenses.

82.    Attached to the Amended Answer and Affirmative Defenses were the "cleared check image(s)" for the Petersons' March 2011 mortgage payment, and every payment through August 2011, that PNC had deposited.

83.    The Petersons made the March 2011 payment, and every payment thereafter, but PNC placed them in suspense because they were allegedly "insufficient."

84.    However, the Petersons' payments were sufficient to cover principle and interest due on their Mortgage.

11

85.     Further, as described above, PNC had no right under the Mortgage to place the Petersons' payments in suspense.

86.     Instead of admitting its mistake again, and correcting it, PNC doubled down and continued to demand payment of illegal amounts, and continued to pursue foreclosure.

87.     In January 2015, PNC sent a reinstatement letter to Smothers, on behalf of the Petersons, demanding a total amount due of $60,420.20.

88.     The total amount due consisted of $438 for "Property Inspections"; $6,380.10 for "Corporate Advance"; and $110 for "BPO."

89.     The default-related fees are illegitimate because PNC had no right to foreclose because the Petersons never defaulted on the Mortgage.

90.     However, PNC has continued to demand payment of illegal fees all to boost its profit at the expense of the Petersons.

91.     On December 3, 2015, Mark Ingram, an associate attorney from Smothers, sent an e-mail to counsel for PNC disputing the foreclosure. Mr. Ingram notified PNC of its error and attached the Petersons bank statements from August 2010 to September 2010. Mr. Ingram explained:

> Attached is my client's credit union statements from August 2010 and September 2010. The Complaint from the previous lawsuit claimed that the payment for 9/1/2010 was missed because the last payment was applied to August 2010's payment due. Well here is proof of both.
>
> Also attached is the settlement agreement reached when PNC discovered the error at that time. Not much to it other than PNC agreeing to pay us money for settlement.
>
> Hopefully this refreshes someone's memory. Let me know if there's anything I can provide to get this moving forward.

12

92.     Inexplicably, PNC and its attorney ignored Mr. Ingram's dispute.

93.     PNC not only continues to report Mrs. Hildmeyer as delinquent, but PNC continues to report Mr. Peterson as delinquent even though he is not liable on the Note.

94.     The Petersons' credit reports have been viewed by employers, and potential employers. PNC's false credit reporting caused Mr. Peterson to lose an approximate $85,000 dollar per year job.

95.     Further, PNC has failed to report the delinquency as disputed despite numerous communications and filings disputing the credit reporting.

96.     On or about August 10, 2017, Smothers sent a written letter to PNC requesting information about the Mortgage, and the amount PNC claimed due and owing.

97.     On September 21, 2017, McGlinchey Stafford, on behalf of PNC, sent a letter that demanded Plaintiff pay $96,948.86.

98.     The total amount PNC demanded includes illegitimate and illegal default-related fees and costs.

99.     The default-related fees and costs are illegitimate and illegal because PNC had no right to initiate the foreclosure.

100.    To date, PNC continues to harass the Petersons by leaving brightly colored door hangers on their home every month.

101.    For example, on August 10, 2017, PNC left a doorhanger attached to the Petersons front door.

102.    PNC intentionally communicates directly with the Petersons attempting to collect a debt when it knows they are represented by Smothers.

103.    On October 13, 2017, Smothers sent PNC a written letter notifying PNC of its accounting errors, and permitting PNC to cure the errors.

104.    Instead of correcting its errors, PNC again doubled down on its position and has refused to dismiss or correct its accounting errors.

## IV.    PNC'S OUTRAGEUOUS AND INTENTIONAL CONDUCT HAS HARMED THE PETERSONS.

105.    After receiving notice of PNC's latest lawsuit, the Petersons were left helpless and demoralized because nothing, not even prevailing against PNC in the previous foreclosure, deterred PNC from trying to take their home.

106.    The Petersons have suffered severe monetary damages due to PNC's illegal conduct, including but not limited to payment of attorney's fees and costs in having to litigate PNC's wrongful foreclosures; payment of illegitimate insurance premiums; and loss of income due to PNC intentionally publishing false, written misrepresentations.

107.    The Petersons have also suffered severe emotional damages.

108.    The Petersons live everyday scared of what PNC will do next because it continues to send people by the Plaintiff's home to conduct unnecessary property inspection.

109.    The Petersons feel as if their "lives are on hold" and they "can't move forward" because they live in a constant state of anxiety hoping they won't lose their home.

110.    Mrs. Hildmeyer has gained weight and had to take blood pressure medication because of PNC's conduct.

14

111.   On or about October 31, 2014, Mrs. Hildmeyer applied for a job with the United States Government, requiring a background check.

112.   On her application, Mrs. Hildmeyer responded to certain questions related to defaulting on any federal debt.

113.   After reviewing Mrs. Hildmeyer's credit report, the Department of Homeland Security initially denied her application because PNC was reporting her as delinquent on her mortgage payments. PNC intentionally published this false information to the credit reporting bureaus.

114.   The Petersons are embarrassed because their neighbors know about the "foreclosure."

115.   Mrs. Hildmeyer says that Mr. Peterson, "just isn't the same anymore", which has affected their marriage.

116.   The Petersons worry daily this nightmare will never end.

117.   To date, and on the advice of counsel, the Petersons have paid their monthly mortgage payment into a separate account, totaling in excess of $50,000.

## COUNT I AS TO PNC'S INTENTIONAL
## INFLICTION OF EMOTIONAL DISTRESS

118.   PNC has intentionally, or with a reckless disregard, engaged in extreme and outrageous conduct during its servicing of the Petersons' mortgage.

119.   PNC knew or should have known that its conduct was extreme and outrageous and that it would cause the Petersons' severe emotional and physical distress.

120.    Because of PNC's insidious conduct, the Petersons' have suffered severe emotional and physical distress, and are entitled to damages.

## COUNT II AS TO PNC'S WRONGFUL
## FORECLOSURE OF THE PETERSONS' HOME

121.    On or about June 8, 2007, the Petersons took out a mortgage on their home at 3585 Canal St. Oviedo, Florida 32765, secured by a $139,500 note (collectively "Mortgage") with National City Mortgage a Division of National City Bank ("National City").

122.    The Mortgage provides the conditions upon which PNC is entitled to declare the Petersons in default and file a lawsuit to foreclose on the Plaintiff's home.

123.    On or about October 24, 2008, PNC acquired National City Bank and the Mortgage.

124.    On or about March 3, 2014, Albertelli Law, on behalf of PNC, filed a "Verified Mortgage Foreclosure Complaint" against the Petersons seeking to foreclose on their home.

125.    PNC alleged the Petersons failed to pay their mortgage payment for March 1, 2011, and for every payment thereafter.

126.    PNC knowingly and intentionally published this false and derogatory information about the Petersons financial condition.

127.    However, PNC had no legal right to file the lawsuit against the Petersons because they were not in default under the Mortgage.

128.    The Petersons paid their March 1, 2011, mortgage payment, and every payment thereafter, which PNC accepted.

16

129.    The Petersons contacted PNC on numerous occasions advising that PNC had no legal right to file and continue on with its lawsuit, but PNC has ignored all advisements.

130.    To date, PNC has not dismissed the lawsuit seeking to foreclose on the Petersons' home.

131.    PNC's outrageous and willful conduct has caused the Petersons monetary loss, and severe mental and emotional distress.

132.    Because of PNC's outrageous and willful conduct, the Petersons are entitled to damages.

## COUNT III AS TO PNC'S COMMON LAW LIBEL

133.    PNC made written, false misrepresentations about the Petersons' credit worthiness to third-party credit reporting agencies.

134.    PNC knew its representations about the Petersons were false or acted in a reckless disregard to the truth, causing the Petersons monetary loss, job loss, and severe mental and emotional distress.

135.    Because of PNC's outrageous and willful conduct, the Petersons are entitled to damages.

## COUNT IV AS TO PNC'S VIOLATION OF THE
## FLORIDA CONSUMER COLLECTION PRACTICES ACT § 559.72(9)

136.    The Petersons are "consumers" as defined by Fla. Stat. § 559.55(8) when they purchased their home by mortgage for personal, family or household use.

137.    PNC is a "person" as defined under the FCCPA.

138.   PNC has knowingly charged the Petersons illegitimate default-related fees and attempted to collect illegitimate debts from the Petersons.

139.   PNC's violation of the FCCPA has harmed the Petersons by depriving them of the statutory right to accurate, clear, and conspicuous information about amounts owed under the Mortgage, and caused them severe mental and emotional distress.

140.   Because of PNC's violation of the FCCPA, the Petersons are entitled to actual damages, plus statutory damages under § 559.77(2) of the FCCPA, together with reasonable attorney's fees and costs.

## COUNT V AS TO PNC'S VIOLATION OF THE
## FLORIDA CONSUMER COLLECTION PRACTICES ACT § 559.72(18)

141.   The Petersons are "consumers" as defined by Fla. Stat. § 559.55(8) when they purchased their home by mortgage for personal, family or household use.

142.   PNC is a "person" as defined under the FCCPA.

143.   PNC communicated directly with the Petersons when it knew the Petersons were represented by counsel.

144.   "Communication" means the conveying of information regarding a debt directly or indirectly to any person through any medium. Fla. Stat. § 559.55(2).

145.   At all times relevant, PNC had Smothers's name and address. Additionally, at no time did Smothers fail to respond to a communication from PNC, nor did Smothers consent to allow direct communication with Plaintiff.

146.    PNC's illegal communications deprived the Petersons of their statutory right to be free from collection activities. PNC's direct communications have also caused the Petersons severe mental and emotional distress.

147.    Due to its FCCPA violation, PNC is liable to the Petersons for actual damages, and statutory damages of up to $1,000.00, together with attorney's fees and costs. *See* § 559.77(2).

## COUNT VI AS TO PNC'S VIOLATION OF THE
## REAL ESTATE SETTLEMENT PROCEDURES ACT 12 U.S.C. § 2605(k)

148.    PNC is a "servicer" because it was responsible for "servicing" the Petersons' mortgage loan when it would receive scheduled periodic payments and make payments of principal and interest from those amounts under the terms of the loan. 12 U.S.C. § 2605(i)(3).

149.    The Petersons' loan is a "federally related mortgage loan" because it is secured by a first or subordinate lien on residential real property designed for the occupancy of one to four families and was made in whole or in part by a lender that had deposits or accounts insured by the FDIC. 12 U.S.C. § 2602(1)(A),(B)(i).

150.    As a servicer of a federally related mortgage loan, PNC must comply with any regulation implementing the provisions of RESPA. *See* 12 U.S.C. § 2605(k)(1)(E).

151.    PNC violated § 2605(k)(1)(E) when it failed to accurately inform the Petersons about the amounts owed under the Mortgage, and when it failed to provide information in a clear and conspicuous manner, as required by 12 CFR § 1024.32(a)(1), *See* 12 CFR § 1024.38(b)(1)(iii).

152.   PNC has a pattern and practice of violating RESPA as evidenced by its filing of two wrongful foreclosures.

153.   Because of PNC's violation of RESPA, the Petersons suffered substantial damage, including but not limited to financial damage and severe mental and emotional distress.

## JURY DEMAND

154.   The Petersons are entitled to and respectfully demand a trial by jury on all issues so triable.

## RELIEF REQUESTED

WHEREFORE, the Petersons respectfully request the Court to enter judgment against PNC for all of the following:

    a.    Actual damages, including but not limited to forgiveness of all amounts not owed.

    b.    Statutory damages.

    c.    Costs and attorney's fees.

    d.    Injunctive and declaratory relief.

    e.    The Court enter an order that PNC and its agents, or anyone acting on its behalf, are immediately restrained from altering, deleting or destroying any documents or records.

    f.    And such other and further relief as the Court may deem just and proper.

Dated: January 11, 2018,        Respectfully submitted,

                    /s/ Darren R. Newhart
                    Darren R. Newhart, Esq.
                    Florida Bar No.: 0115546

E-mail: darren@cloorg.com
J. Dennis Card, Jr.
Florida Bar No.: 0487473
E-mail: DCard@Consumerlaworg.com
Consumer Law Organization, P.A.
721 US Highway 1, Suite 201
North Palm Beach, Florida 33408
Telephone: (561) 822-3446
Facsimile: (305) 574-0132