**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION**

| | | |
|---|---|---|
| DONALD A. PETERSON and LORI HILDMEYER, | ) ) ) | Civil Action No.: 6:18-cv-84-Orl-31DCI |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| PNC BANK, N.A., | ) ) | |
| Defendant. | ) ) | |

## PLAINTIFFS' FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs, Donald A. Peterson and Lori Hildmeyer, husband and wife, (collectively the "Petersons") sue Defendant, PNC Bank, N.A. ("PNC") for violating the Florida Consumer Collection Practices Act § 559.55 *et seq.* ("FCCPA") and the Real Estate Settlement Procedures Act § 2601 *et seq.* ("RESPA"), and for committing intentional infliction of emotional distress and constructive fraud.

### PARTIES, JURISDICTION, AND VENUE

1.      This is an action for damages over $75,000.00

2.      Donald A. Peterson and Lori Hildmeyer are natural persons residing in Seminole County, Florida.

3.      PNC is a national association with its headquarters at 249 Fifth Avenue One PNC Plaza Pittsburgh, PA 15222.

4.      The Court has diversity jurisdiction and subject matter jurisdiction under 28 U.S.C. § 1331 because this action arises out of RESPA, a federal statute.

5.      The Court has supplemental jurisdiction over the state law claims under 28

U.S.C. § 1367 because the basis of the federal claim involves the same illegal practices that

support the state claims.

6.      The Court has personal jurisdiction because PNC does business throughout the

United States, including Florida. Further, its voluntary contact with Plaintiffs to charge debts

in Florida made it foreseeable that PNC would be haled into a Florida court. *See Burger King*

*Corp. v. Rudzewicz*, 471 U.S. 462, 474 (1985).

7.      Venue is proper in this District under 28 U.S.C. §§ 1391(b)-(c) because PNC is

deemed to reside in any judicial district in which it is subject to personal jurisdiction when the

action is commenced and because PNC's contacts with this District are sufficient to subject it

to personal jurisdiction.

## FACTUAL ALLEGATIONS

8.      On or about June 8, 2007, the Petersons took out a mortgage on their home at

3585 Canal St. Oviedo, Florida 32765, secured by a $139,500 note (collectively "Mortgage")

with National City Mortgage a Division of National City Bank ("National City"). The

Mortgage and Note are attached as Exhibit "1."

9.      Fannie Mae owns the Petersons' Mortgage.

10.     PNC has serviced the Mortgage for Fannie Mae since 2008.

11.     As Fannie Mae's servicer, PNC must comply with Fannie Mae's Single-

Family Servicing Guide ("Guidelines").

## I.     PNC BEGINS SERVICING THE PETERSONS' MORTGAGE

12.     In early 2008, National City claimed the Petersons were delinquent on their mortgage payments.

13.     The Petersons were not delinquent because National City had accepted and deposited the Petersons' mortgage payments, including payments for April, May, and June of 2008.

14.     The Petersons called National City dozens of times and disputed the alleged delinquency.

15.     Despite the dispute and evidence of payment, on or about August 1, 2008, National City referred the Petersons' Mortgage loan to foreclosure.

16.     National City then hired the Law Offices of David J. Stern, P.A., to start foreclosure proceedings on the Petersons' home.

17.     Notably, the Law Offices of David J. Stern, P.A. was the subject of many lawsuits and attorney general investigations for illegal conduct involving its "foreclosure mill" law firm.

18.     On or about October 24, 2008, PNC acquired the now defunct National City Bank, thereby acquiring the servicing rights to the Petersons' Mortgage.

19.     Several months later, on December 1, 2008, PNC, through the Law Offices of David J. Stern, P.A. filed a complaint for foreclosure against the Petersons.[1]

---

[1] *National City Mortgage, A Division of National City Bank v. Donald A. Peterson et al.*, Case No.: 2008CA007760 ("First Foreclosure").

20.     Afterwards, PNC discovered that it misapplied the Petersons' mortgage payments and no default occurred.

21.     Nevertheless, on December 18, 2008, PNC required the Petersons to reinstate the Mortgage loan to avoid further foreclosure.

22.     The reinstatement allowed PNC to collect twice the amount it should have from the Petersons for those monthly mortgage payments.

23.     On or about January 9, 2009, after the reinstatement, PNC dismissed the first foreclosure lawsuit.

24.     To ensure this mistake wouldn't happen again, the Petersons started hand delivering their mortgage payments to a local PNC branch office.

## II.     AFTER REINSTATEMENT, PNC'S SERVICING ERRORS CONTINUE

25.     In early 2009, PNC force-placed hazard insurance on the Petersons' home.

26.     On or about June 6, 2009, the Petersons received a refund for force-placed hazard insurance that PNC placed on the Petersons' home because the Petersons had sufficient coverage.

27.     Four months later, in October 2009, PNC again force-placed hazard insurance on the Petersons' home. (*Id.*)

28.     The next month, PNC once again received evidence that the Petersons' maintained sufficient hazard insurance coverage. (*Id.*)

29.     Then from December 1, 2009 through March 3, 2010, PNC held the Petersons' mortgage payments in a suspense account.

30.     In total, PNC held $4,803.38 without applying the funds to principal and interest under the Mortgage.

31.     The Guidelines and Mortgage specifically prohibited PNC from retaining the Petersons' funds in that manner. (Guidelines § 101.03 pg. 301-3).[2]

32.     On or about March 3, 2010, PNC finally applied the withheld funds to the Petersons' Mortgage loan.

33.     However, before applying the funds, PNC paid itself $357.99 in late fees.

34.     PNC had no entitlement to charge and collect the late fees because the Petersons' mortgage payments weren't late.

35.     For a third time, on or about April 11, 2010, PNC force-placed hazard insurance on the Petersons' home.

36.     The force-placed hazard insurance premium was $1,581.06, which PNC paid from escrow.

37.     But the Mortgage precluded PNC from paying the premium from escrow because the Petersons had an escrow waiver for hazard insurance.[3]

---

[2]"Sometimes payments received from the borrower are less than the total amount due.…If the servicer decides to accept the payment, any portion of it it equals one or more full installments should be applied. Any remaining portion should be held as unapplied funds until enough money to make a full installment is received.… However, the servicer may not impose any late fee or delinquency charge in connection with that payment or any subsequent payment held as unapplied from which funds are drawn to make a full payment. Payments that cover the full mortgage obligation without the late charge may not be returned to the borrower to the extent that acceptance would not jeopardize the servicer's position in legal proceedings (e.g., foreclosure). The borrower should be fully informed of the actions taken, the reasons for the specific action, and the total amount that he or she owes and is expected to pay."

[3] *See* (Ex. 1 ¶ 3) ("Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time.")

38.     At the same time, PNC increased the Petersons' mortgage payment amount from approximately $1,111.00 to $1,414.19 effective June 1, 2010, to account for the escrow deficiency that PNC had created. (Bates 0056-0058 is attached as Exhibit "2").

39.     The next month, on or about May 7, 2010, PNC received a $1,234.95 refund for the force-placed hazard insurance premium because sufficient hazard insurance coverage existed.

40.     Although PNC still claimed the Petersons owed $346.11 for an alleged three-month lapse in coverage.[4]

41.     PNC had two options to collect the $346.11, it could: (1) do nothing and allow the shortage to exist; or (2) require the Petersons to repay the shortage in equal monthly payments over at least a twelve-month period. 12 C.F.R. § 1024.17(f)(3)(ii).[5]

42.     On or about June 11, 2010, PNC accepted the Petersons' June 2010 mortgage payment of $1,115 and placed it in suspense, claiming the amount was insufficient.

43.     On June 14, 2010, PNC sent the Petersons a letter. (Bates 0059 is attached Exhibit "3").

44.     In the letter, PNC advised that the June 2010 mortgage payment was short because the Petersons' "new" mortgage payment amount was $1,314.83.[6] (*Id.*)

---

[4] The Petersons deny that they ever owed the $346.11.
[5] $346.11/12 = $28.84
[6] PNC hasn't explained why the monthly installment amount changed from $1,414.19 to $1,314.83.

[1738419/1]                                         6

45.    The Petersons' mortgage payment was not $1,314.83 because PNC never recalculated the payment amount after it received a refund for the force-placed hazard insurance premium.

46.    The next month, PNC accepted the Petersons' July 2010 mortgage payment of $1,120, which PNC again placed in suspense.

47.    On or about July 19, 2010, PNC sent the Petersons a letter explaining that their July 2010 mortgage payment was insufficient because the amount was less than $1,314.83. (Bates 0060 is attached as Exhibit "4").

48.    In the July 2010 letter, PNC explained that it would hold the Petersons' funds in suspense until the Petersons paid an additional $194.83. (*Id.*)

49.    PNC further explained:

Your funds will be held in a suspense account until August 09, 2010. If we do not hear from you by then, the funds will be applied to your mortgage account in the following order (if owed): negative escrow balances, late charges, returned check fees, property inspection fees, and any other fees due. Any remaining funds will be returned to you.

(*Id.*)

50.    PNC had no right under the Mortgage to apply the Petersons' mortgage payments in that manner.[7]

_____

[7] (Ex. 1 ¶ 2) ([A]ll payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.); (Guidelines § 101, pg. 301-2) ("Payments must be applied in the following order for a mortgage loan closed on one of the uniform security instruments that has a date of March 1999 or later: (1) first to interest; (2) then to principal; (3) then to any required deposits for escrow items (which include taxes and assessments, property or mortgage insurance premiums, leasehold payments or ground rents, and community association dues, fees, and charges, as applicable). When the payment includes late charges, the late charges should be applied only after all of the scheduled payment has been applied.")

51.     On July 28, 2010, PNC again force-placed hazard insurance on the Petersons' home.

52.     PNC never gave the Petersons proper written notice before charging the force-placed hazard insurance in July 2010. 12 CFR § 1024.37(c) *et seq.*

53.     On or about August 13, 2010, PNC accepted the Petersons' August 2010 mortgage payment of $1,120, and placed it in suspense with the July 2010 mortgage payment.

54.     At that point, the Mortgage required PNC to take the Petersons' July 2010 mortgage payment from suspense and apply the funds to principal and interest under the Mortgage. [8]

55.     Instead, PNC paid itself $592.83 from those funds for late fees and other amounts.

56.     On or about September 13, 2010, PNC accepted the Petersons' September 2010 mortgage payment of $1,120, and placed it in suspense.

57.     Again, PNC never applied the funds held in suspense to principal and interest under the Mortgage.

---

[8](Ex. 1 ¶ 2) ([A]ll payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.); (Guidelines § 101, pg. 301-2) ("Payments must be applied in the following order for a mortgage loan closed on one of the uniform security instruments that has a date of March 1999 or later: (1) first to interest; (2) then to principal; (3) then to any required deposits for escrow items (which include taxes and assessments, property or mortgage insurance premiums, leasehold payments or ground rents, and community association dues, fees, and charges, as applicable). When the payment includes late charges, the late charges should be applied only after all of the scheduled payment has been applied.")

58.     On or about September 22, 2010, Don Brown, the Petersons' executor and trustee, and Mr. Peterson spoke with PNC's representative "LTX" in PNC's hazard insurance department.

59.     During their conversation, Mr. Peterson advised that no lapse in coverage existed between January 2010 and April 2010 and he disputed PNC paying hazard insurance from escrow. (*Id.*)

60.     That same day, Mr. Brown and Mr. Peterson also spoke with PNC's employee "KPJ." (Bates 0544 is attached as Exhibit "5").

61.     During that call, Mr. Peterson again disputed PNC's application of the Petersons' mortgage payments. (*Id.*)

62.     KPJ explained to Mr. Peterson that "IF WE RECVD SHORT PYMT FUNDS [, those funds] ARE APPLIED TO ANY OUTSTANDING FEES AND REMAINING BAL IS RETURNED." (*Id.*)

63.     Again, the Mortgage prohibited PNC from applying the Petersons' mortgage payments in that manner. (Ex. 1 ¶ 2).

64.     On or about September 28, 2010, Mr. Peterson again called PNC disputing the improper application of payments and the force-placed hazard insurance PNC placed on their home.

65.     The next day, on September 29, 2010, PNC accepted the Petersons' October 2010 mortgage payment of $1,582.81, and placed the funds in suspense.

66.     PNC then applied funds from suspense to the Petersons' July 2010 mortgage payment.

67.     PNC confirmed that it paid hazard insurance from escrow in error because on or about October 5, 2010, PNC sent the Petersons an apology letter for previously escrowing the hazard insurance. (The Apology Letter is attached as Exhibit "6").

68.     On or about October 7, 2010, PNC received a refund check of $1,661 for "HAZARD OVERPAYMENTS PAID BY INSURED[,]" also confirming that the Petersons kept adequate hazard insurance on their home. (*Id.*)

69.     Despite the apology, PNC never accounted for the hazard insurance refund because on or about October 29, 2010, PNC accepted the Petersons' mortgage payment of $1,120, and once again placed it in suspense.

70.     Then, on or about November 1, 2010, PNC applied $1,112 held in suspense to the Petersons' August 2010 mortgage payment.

71.     That same day, PNC allegedly sent a default letter to the Petersons claiming the Petersons never paid the September 2010 mortgage payment or any payment thereafter.

72.     Though it was holding thousands of dollars in suspense when it sent the November 2010 default letter, PNC still demanded the Petersons pay $4,496.57 to cure the alleged default.

73.     Several days later, on or about November 9, 2010, PNC paid itself $94.74 in late charges from the funds held in suspense but did not apply any funds to the alleged "missed payments."

74.     On or about December 6, 2010, PNC accepted the Petersons' mortgage payment of $1,116.17, and again placed it in suspense.[9]

75.     On or about January 1, 2011, PNC performed an escrow analysis on the Petersons' Mortgage. (The escrow analysis is attached as Exhibit "7").

76.     The analysis showed that the Petersons made all of their payments because they had a surplus of $343.57 in their escrow account. (*Id.*)

77.     The analysis also showed that the Petersons' mortgage payment amount for 2010 was $1,112.30, the amount the Petersons had been paying, and effective March 1, 2011, the Petersons' new mortgage payment would be $1,114.42. (*Id.*)

78.     The above servicing misconduct violated the Guidelines and PNC's own policies and procedures.

## III.   SEVERAL FEDERAL AGENCIES INVESTIGATE PNC FOR UNSOUND AND UNSAFE MORTGAGE SERVICING CONDUCT.

79.     In early 2010, the Federal Reserve System, the Office of the Comptroller of the Currency (OCC), the Federal Deposit Insurance Corporation (FDIC), and the Office of Thrift Supervision (OTS) conducted reviews of foreclosure processing for several mortgage servicers.   The   review   included   PNC.   (https://www.occ.gov/news-issuances/news-releases/2011/nr-occ-2011-47a.pdf) (last visited 6/25/2018).

---

[9] This same process has repeated itself time and again on the Petersons' Mortgage.

80.     "The reviews found critical weaknesses in [PNC's] foreclosure governance processes, foreclosure document preparation processes, and oversight and monitoring of third party vendors, including foreclosure attorneys." (*Id.*)

81.     The agencies stated:

> At this time, the agencies are taking formal enforcement action against each of the 14 servicers and parent bank holding companies because the deficiencies and weaknesses identified during the reviews represent unsafe or unsound practices and violations of applicable law. The foreclosure-file reviews showed that borrowers in the sampled pool were seriously delinquent. The reviews also showed that the appropriate party brought the foreclosure action. However, a limited number of mortgages should not have proceeded to foreclosure because of an intervening event or condition. Nevertheless, the weaknesses in servicers' foreclosure processes, as confirmed by the reviews, present significant risk to the safety and soundness of mortgage activities. The failures and deficiencies identified as part of the reviews must be remedied swiftly and comprehensively.

(*Id.*)

82.     Because of the agencies' review, PNC agreed to a Consent Order with the Comptroller of the Currency of the United States of America ("Comptroller") and the national bank examiners and other staff of the Office of the Comptroller of the Currency ("OCC"). (A PDF copy can be seen at https://www.occ.gov/news-issuances/news-releases/2011/nr-occ-2011-47i.pdf).

83.     In the Consent Order, the Comptroller found:

> In connection with certain foreclosures of loans in its residential mortgage servicing portfolio, [PNC]…failed to devote sufficient financial, staffing and managerial resources to ensure proper administration of its foreclosure processes; (d) failed to devote to its foreclosure processes adequate oversight, internal controls, policies, and procedures, compliance risk management, internal audit, third party management, and training; and (e) failed to sufficiently oversee outside counsel and other third party providers handling foreclosure-related services.

(*Id*. pg. 2).

84.     The Comptroller ultimately concluded that PNC "engaged in unsafe or unsound banking practices." (*Id*. at pg. 3).

85.     PNC engaged in the same "unsound and unsafe" servicing practices while servicing the Petersons' Mortgage.

86.     The Consent Order required PNC to establish policies and procedures to ensure its servicing conduct complied with federal and state law, and the terms and conditions in a borrower's mortgage.

87.     However, despite acknowledging its systematic servicing errors, PNC failed or otherwise refused to address these problems as they applied to the Petersons' loan.

## IV.   PNC'S SERVICING ERRORS LEAD TO A SECOND FORECLOSURE LAWSUIT, WHICH PNC ADMITTED WAS FILED IN ERROR.

88.     Despite knowing the Petersons hadn't defaulted, and knowledge of its serious internal servicing problems, PNC again referred the Petersons' Mortgage to foreclosure.

89.     Against its own policies and procedures, and the Consent Order, PNC performed no investigation on the Petersons' Mortgage loan account to determine whether any default actually occurred.

90.     On or about September 1, 2011, Albertelli Law, on behalf of PNC, filed a "Verified Mortgage Foreclosure Complaint" against the Petersons on.[10]

---

[10] *PNC Bank, National Association, Successor by Merger to National City Mortgage, a Division of National City Bank v. Lori Hildmeyer and Donald Peterson et al.,* Case No. 11CA-3571-14-W ("Second Foreclosure").

91.     After the Second Foreclosure was placed in the public record, strangers arrived and invaded the Petersons' property causing the Petersons to feel unsafe and afraid in their own home.

92.     The "Verified Complaint" alleged that the "Note and Mortgage" were in default because the "required installment payment of September 1, 2010, was not paid and no subsequent payments [were] made."

93.     That "verified" allegation was false because the Petersons paid—and PNC accepted—the September 1, 2010, installment payment, and all of their payments after.

94.     On or about October 25, 2011, PNC employee, "E COLON", from a local branch contacted PNC, after speaking with the Petersons, and asked about the payment misapplication issues that occurred on the Petersons' Mortgage loan account.

95.     During that call, PNC verified that the Petersons occupied the Property, and it established "RIGHT PARTY CONTACT." (*Id.*)

96.     On or about November 10, 2011, E Colon called PNC back about the Petersons' Mortgage loan. (*Id.*)

97.     Ms. Colon explained that the Petersons had paid their mortgage payment since August 2010 and that errors had occurred concerning PNC's application of the Petersons' mortgage payments. (*Id.*)

98.     At that same time, in November 2011, PNC was holding $5,592.34 of the Petersons' funds in suspense.

99.     On or about November 10, 2011, PNC applied the funds held in suspense to these mortgage payments:

- September 1, 2010 - $1,143.14

- October 1, 2010 - $1,112.30

- November 1, 2010 - $1,112.30

- December 1, 2010 - $1,112.30

- January 1, 2011 - $1,112.30

100.   On or about November 18, 2011, PNC accepted the Petersons' mortgage payment of $1,116.17, and applied it to suspense.

101.   Eventually, PNC refused to accept the Petersons' mortgage payments.

102.   The Petersons retained the Smothers Law Firm, P.A. ("Smothers") and paid him to defend the foreclosure.

103.   On January 13, 2012, Smothers filed an Answer and Affirmative Defenses.

104.   The Second Affirmative Defense states:

Plaintiff alleges that the Defendants defaulted on the Note and Mortgage as a result of non-payment of the September 1, 2010 installment. However, the Defendants tendered payment on September 1, 2010, and they have made subsequent payments which have been accepted by the Plaintiff or by Plaintiff's predecessor in interest. Therefore, Plaintiff was incorrect in alleging that the Note and Mortgage are in default.

(*Id*.)

105.   But for the next year, PNC continued to harass the Petersons through phone calls and letters.

106.   During that time, PNC also charged the Petersons over $3,000 in fees and costs related to the alleged default under the Mortgage.

107.    On or about October 31, 2012, PNC also force-placed flood insurance on the Petersons' home and charged them $1,673.63 for the premium.

108.    A month later, on or about November 27, 2012, FEMA revised the special flood zone hazard area for the Petersons' home.

109.    The revision was effective November 27, 2012.

110.    That revision excluded the Petersons' home from being in a flood zone which meant the Petersons no longer needed flood insurance.

111.    But PNC continued to charge the Petersons for flood insurance through February 4, 2013.

112.    PNC's failure to refund the proper amount for flood insurance caused further inaccuracies in the Petersons' escrow account.

113.    Despite holding thousands of dollars in suspense, and after Albertelli Law and PNC litigated the Second Foreclosure for more than a year, PNC *agreed* that it wrongfully filed and prosecuted the lawsuit.

114.    On or about February 11, 2013, PNC filed a Notice of Voluntary Dismissal and Release of Lis Pendens. (The Notice of Voluntary Dismissal is attached as Exhibit "8").

115.    The Notice states: **This case is being dismissed due to being Referred to Foreclosure in Error**…" *Id.* (emphasis added.)

116.    The Court ordered PNC to pay the Petersons' attorney's fees and litigation costs.

## V.   PNC'S SERVICING ERRORS CONTINUE EVEN AFTER PNC DISMISSED THE SECOND ERRONEOUS FORECLOSURE.

117.   After the Second foreclosure was dismissed, the Petersons tried to work with PNC to fix the servicing errors that caused the Second Foreclosure.

118.   But PNC rejected their attempts because it *still* considered the Petersons in default and it still demanded they pay the default-related fees and costs PNC allegedly incurred in the Second Foreclosure.

119.   Instead, on or about December 5, 2013, PNC's employee, Tina Preston, entered a servicing note for the Petersons' Mortgage loan account: "SYSTEM UPDATED FOR THE FOLLOWING EVENT: USER HAS ENDED THE ISSUE ASSOCIATED WITH THIS LOAN. ISSUE TYPE: SUB-PROCESS NOT NEEDED. COMMENTS: OPENED FC RESTART PROCESS. NEEDS TO BE RE-BREACHED." (Bates 0498 is attached as Exhibit "9").

120.   Ms. Preston followed that entry with: "User has Completed the Whyresrtneeded (*sic*) data form with the following entries: WHY IS RESTART NEEDED: : Other Comments ::: NEEDS REBREACHED. (If Questions, contact templekerns, PNC legal department…." *Id*.

121.   PNC made its intention clear through these entries: no matter what it would take, PNC wanted to foreclose on the Petersons again—even if it meant PNC had to force a "re-breach" of the Mortgage.

122.   Five days later, on December 10, 2013, PNC referred the Petersons' Mortgage account again to Albertelli Law to start yet another foreclosure.

123.  PNC disregarded its own policies and procedures by conducting no review of the Petersons' Mortgage loan account before referring it to foreclosure.

124.  PNC's sole motivation was—and still is—unreasonable financial gain.

125.  Before any litigation commenced, on or about February 24, 2014, PNC's employee, Sharon Lynch, "verified" the allegations in the third foreclosure complaint PNC planned to file against the Petersons.

126.  Ms. Lynch conducted no investigation on whether the Petersons actually defaulted under the Mortgage.

127.  If she would have, Ms. Lynch would have discovered that the Petersons never breached or defaulted under the Mortgage.

128.  Moreover, PNC never sent the Petersons a notice of breach before it filed the Third Foreclosure.[11]

129.  PNC's conduct violated the Consent Order and its own policies and procedures.

130.  Shortly before March 3, 2014, PNC again hired Albertelli Law to seek foreclosure of the Petersons' home.

---

[11] (Ex. A ¶ 20) ("Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action.").

131.     On or about March 3, 2014, Albertelli Law, on behalf of PNC, filed another "Verified Mortgage Foreclosure Complaint" against the Petersons seeking to foreclose on their home, which is pending.[12]

132.     The Verified Complaint alleges the Petersons didn't make their mortgage payment on March 1, 2011, and no later payments had been made.

133.     The Petersons again were forced to hire Smothers to defend the lawsuit.

134.     Smothers filed a notice of appearance for the Petersons on June 16, 2014.

135.     Smothers filed an Amended Answer & Affirmative Defenses and attached the "cleared check image(s)" for the Petersons' March 2011 mortgage payment, and every payment through August 2011, that PNC had deposited. (The checks are attached as Exhibit "10").

136.     On or about December 12, 2014, PNC received correspondence from Smothers telling PNC to direct all communications to him concerning the Petersons, the foreclosure lawsuits, and any amounts allegedly owed under the Mortgage.

137.     PNC entered a note in the servicing log that stated: "WRITTEN 3RD PARTY AUTH ATTNY REPRESENTED." (Bates 0417 is attached as Exhibit "11").

138.     Since December 12, 2014, PNC knew that Smothers represented the Petersons about the foreclosure lawsuit and any alleged debts PNC claimed the Petersons owed.

139.     To try and understand what servicing errors had occurred, Smothers on behalf of the Petersons sent a written request for information and notice of error to PNC.

---

[12] *PNC Bank, National Association, v. Lori Hildmeyer and Donald A.  Peterson et al.,* Case No. 59-2014-CA-000557.

140.     In response, PNC performed an investigation to determine "IF/WHEN BRWRS PYMTS WERE APPLIEDAND (*sic*) IF APPLIED TO THE WRONG ACCT IN ERROR AS CLAIMED." (*Id.*)

141.     At that point, the Consent Order, RESPA, and its own policies and procedures required PNC to perform an investigation and correct the servicing errors identified by the Petersons.

142.     PNC's investigation, though, was unreasonable because it didn't identify the payment application errors, the force-placed insurance errors, or the misapplication of funds to suspense, or any other servicing errors.

143.     PNC also received a written request for information from the Petersons about the amount they allegedly owed under the Mortgage.

144.     PNC responded with a reinstatement quote. (The reinstatement quote is attached as Exhibit "12").

145.     The reinstatement quote claimed the Petersons owed a Total Reinstatement Amount of $60,420.26. *Id.*

146.     The total amount due consisted of $438 for "Property Inspections"; $6,380.10 for "Corporate Advance" fees; and $110 for "BPO." *Id.*

147.     All of the default-related fees and costs are illegitimate because the Petersons never defaulted under the Mortgage.

148.     Specifically, though, at least $3,000 of the "Corporate Advance" was for default-related fees and costs that PNC allegedly incurred in the Second Foreclosure, which PNC dismissed as having been "filed in error."

149.    PNC knew these charges were illegitimate because its accounting records reflect that the charges were incurred in the previous wrongful foreclosure.

150.    The BPO charge is also artificially marked-up so PNC can keep the difference as undisclosed profit. Especially considering the typical cost of a BPO is less than $50.

151.    Despite knowing these fees and costs were illegitimate, PNC still demanded the Petersons pay them.

152.    In or about November 2015, PNC conducted another investigation on the Petersons' Mortgage account to discover whether it was holding any of the Petersons' funds in suspense.

153.    The investigation revealed that PNC held $1,810.17 of the Petersons' money in an escheatment account.

154.    PNC had the $1,810.17 in an escheat account for several years without applying the funds to the Mortgage or refunding them to the Petersons.

155.    On December 3, 2015, Mark Ingram, an associate attorney from Smothers, sent an e-mail to PNC's counsel. Mr. Ingram explained why PNC's third foreclosure was illegal and improper. Mr. Ingram attached the Petersons' bank statements from August 2010 to September 2010 and explained:

> Attached is my client's credit union statements from August 2010 and September 2010. The Complaint from the previous lawsuit claimed that the payment for 9/1/2010 was missed because the last payment was applied to August 2010's payment due. Well here is proof of both.
>
> Also attached is the settlement agreement reached when PNC discovered the error at that time. Not much to it other than PNC agreeing to pay us money for settlement.

Hopefully this refreshes someone's memory. Let me know if there's anything I can provide to get this moving forward.

156.    PNC performed another investigation on the Petersons' Mortgage.

157.    Unsurprisingly, on or about February 4, 2016, PNC's research revealed that the Petersons never defaulted under the Mortgage.

158.    The research also revealed that PNC had no legal or factual basis to file the Third Foreclosure lawsuit against the Petersons.

159.    On or about April 11, 2016, PNC finally took the $1,810.17 from the escheat account, placed it suspense, and applied $1,114.27 to the Petersons' March 1, 2011, installment payment.

160.    PNC held the remainder in suspense for over a year after.

161.    On or about April 11, 2016, PNC charged the Petersons $15 for a property inspection.

162.    The property inspection is unreasonable because the Petersons have continually lived in and maintained their home. Further, the property inspection is unreasonable because it does nothing to protect Fannie Mae's interest in the Petersons' property.

163.    Despite being unreasonable and unnecessary, PNC orders and charges the Petersons for property inspections every month.

164.    This violates the Consent Order and PNC's own policies and procedures.

165.    On or about April 14, 2016, PNC contacted Smothers about loss mitigation options for the Petersons.

166.    During that conversation, PNC's employee gave Smothers false information about loss mitigation because it knew that no default had occurred under the Mortgage.

167.    Despite communicating with Smothers, and knowing his firm represented them, PNC directly communicated with the Petersons in attempt to collect a debt.

168.    On or about July 14, 2017, PNC ordered its third-party vendor, Safeguard, to leave a brightly colored door hanger at the Property. (The door hanger is attached as Exhibit "13").

169.    On or about August 10, 2017, PNC again ordered its third-party vendor "SPI" to leave a brightly colored door hanger at the Property. (The door hanger is attached as Exhibit "14").

170.    Because the Petersons and Smothers never received accurate information from PNC, on or about August 10, 2017, Smothers sent another written letter to PNC requesting information about the amount PNC claimed due and owing under the Mortgage. (The letter is attached as Exhibit "15").

171.    PNC received the letter on August 14, 2017. (*Id*.)

172.    In turn, PNC generated a payment history and researched the Petersons' Mortgage loan account to verify the amount it claimed the Petersons owed to reinstate the Mortgage.

173.    PNC reviewed the figures in the reinstatement quote and verified them as accurate, but those amounts weren't accurate because they included illegitimate debts not owed.

174.    On September 21, 2017, McGlinchey Stafford, on behalf of PNC, responded to the August 2017 letter with the reinstatement quote PNC generated. (The reinstatement quote is attached as Exhibit "16").

175.    In the reinstatement quote, PNC demanded the Petersons pay a total amount of $96,948.86. (*Id.*)

176.    The total amount due included $1,114.42 representing the Petersons' March 2011 mortgage payment.

177.    However, the March 2011 mortgage payment wasn't due and owing because PNC already applied $1,114.42 of the Petersons' money, which was missing in an escheat account, to the March 2011 mortgage payment.

178.    The total amount due also included illegitimate property inspections fees and illegitimate corporate advance fees that PNC carried over from the Second Foreclosure. (*Id.*).

179.    On or about October 13, 2017, Smothers sent a written letter to PNC. The letter notified PNC of servicing errors involving: payment application and processing, force-placed hazard and flood insurance, and default-related fees and costs.

180.    Smothers also notified PNC of its error in continuing to litigate the Third Foreclosure.

181.    After receiving the letter, RESPA, and its own policies and procedures, required PNC to perform a reasonable investigation into the errors and provide Smothers with a response. 12 CFR §§ 1024.34, 1024.35.

182.    On or about October 16, 2017, PNC sent a monthly mortgage statement to Smothers on behalf of the Petersons. (The monthly statement is attached as Exhibit "17").

183.    The amount PNC claimed due and owing in the October 2017 billing statement was inaccurate because PNC overcharged the Petersons for flood insurance in 2013.

184.    On or about November 6, 2017, PNC discovered that in 2013 it overcharged the Petersons' escrow account for flood insurance. (Bates 0284 is attached as Exhibit "18").

185.    Several days later, PNC issued a $316.11 refund for the improper flood insurance overcharge. (*Id*.)

186.    On or about November 27, 2017, PNC, through counsel, responded to Smothers' notice of error letter. (PNC's response is attached as Exhibit "19").

187.    In its response, PNC claimed that in 2010, the Petersons' "new" monthly installment payment effective June 1, 2010, was $1,314.83, and "the payments submitted to PNC following the May 2010 Annual Escrow Account Disclosure Statement were never adjusted and continued to be less than the full amount of the new payment." (*Id*.)

188.    That statement is untrue for several reasons.

189.    First, the escrow analysis PNC provided the Petersons in 2010 states that the Petersons' new mortgage payment was $1,414.19, not $1,314.83.

190.    Second, PNC received a refund for force-placed hazard insurance but never calculated that refund back into the Petersons' Mortgage loan.

191.    Instead, PNC falsely claimed the Petersons' mortgage payments were short, placed them in suspense, and raided the escrow and suspense accounts to pay itself for various fees and costs.

192.    In the letter, PNC also states that "A full monthly payment was received on November 18, 2011 in the amount of $1,167.17 and applied as the February 2011 payment,

bringing your loan due for the March 2011 payment. No further payments have been received, and your account is in default for failure to make the March 2011 payment and all subsequent payments." (*Id.*)

193.    Once again, that statement is untrue because PNC's own records show that on or about April 11, 2016, PNC applied $1,114.27 from the funds it held in escheatment to the Petersons' March 1, 2011, installment payment.

194.    PNC then explains: "On February 19, 2013, PNC sent you a letter advising that your flood insurance coverage would be cancelled, effective February 4, 2013. A copy of the February 19, 2013 correspondence is enclosed herewith. No flood insurance has been required to be on your account since February 4, 2013, and no amounts have been charged to your account for flood insurance coverage since then." (*Id.*)

195.    PNC never told the Petersons about the flood insurance overcharge.

196.    After not getting a straight answer from PNC, on or about March 23, 2018, Smothers, on behalf of the Petersons, sent PNC a written request for information about $695.86 of the Petersons' funds sitting in "Unapplied Funds." (The request for information is attached as Exhibit "20").

197.    On or about May 9, 2018, PNC responded, through counsel, to Smothers' request for information. (PNC's response is attached as Exhibit "21").

198.    PNC explained that "[o]n December 1, 2015, the $1,810.28 in the escheat account was put in to suspense. On April 11, 2016, a payment was applied to your account from the funds in suspense, in the amount of $1,114.42, bringing your loan due for the March 1, 2011 payment." (*Id.*)

199.   PNC's response was purposely deceptive. As we know, on or about April 11, 2016, PNC applied $1,114.27 from the funds it held in escheatment to the Petersons' March 1, 2011, installment payment.

## VIII.   PNC'S OUTRAGEOUS AND INTENTIONAL CONDUCT HAS HARMED THE PETERSONS

200.   PNC's misconduct has left the Petersons helpless and demoralized.

201.   The Petersons have paid thousands in out-of-pocket expenses due to PNC's illegal conduct, including but not limited to payment of attorney's fees and costs; payment of illegitimate insurance premiums; and loss of income.

202.   PNC has also charged and demanded the Petersons pay illegitimate default-related fees and costs.

203.   For example, under the Guidelines, a property inspection is unreasonable if the servicer has achieved Quality Right Party Contact and the borrower lives in and maintains the home. (Guidelines D2-2-01, pg. 397; § D2-2-11, pg. 416).

204.   The Petersons and Smothers have told PNC that they live in and maintain their home, and they have tried to work with PNC to fix its servicing errors, which PNC has refused.

205.   Because PNC has achieved Quality Right Party Contact with the Petersons and it knows they live in and maintain their home, PNC's property inspections are unreasonable and unnecessary.

206.   In doing so, PNC has sent strangers to drive by the Petersons' Property for an "inspection" every month.

207.    On several occasions, these strangers confronted the Petersons making them feel scared and uncomfortable.

208.    The Petersons have also suffered severe emotional and physical damages due to PNC's willful conduct.

209.    The Petersons live everyday scared of what PNC will do next because it continues to send people by their home to conduct unnecessary property inspections.

210.    The Petersons feel as if their "lives are on hold" and they "can't move forward" because they live in a constant state of anxiety.

211.    Mrs. Hildmeyer has gained weight and had to take blood pressure medication because of PNC's conduct.

212.    Mrs. Hildmeyer says that Mr. Peterson, "just isn't the same anymore", which has affected their marriage.

213.    The Petersons worry daily this nightmare will never end.

## COUNT I AS TO PNC'S INTENTIONAL
## INFLICTION OF EMOTIONAL DISTRESS

214.    The Petersons incorporate paragraphs (1)-(213) as if set forth herein.

215.    As the Petersons' mortgage servicer, PNC holds a position of power over the Petersons that magnifies the outrageousness of its conduct.

216.    PNC has intentionally and recklessly abused that position of power for the past (10) years and continues to do so.

217.    PNC's employees and agents have frequently harassed the Petersons throughout this campaign with hundreds of phone calls, letters, and on-site "inspections" of the Petersons' home.

218.    PNC has also knowingly held the Petersons' mortgage payments in suspense, assessed and paid itself illegitimate late fees and other default-related fees and costs, misapplied the Petersons' mortgage payments, and misplaced the Petersons' mortgage payments repeatedly throughout PNC's relationship with the Petersons.

219.    The Petersons repeatedly notified PNC that these serious servicing errors existed on their Mortgage loan account, but PNC has done nothing to correct or fix them.

220.    PNC has pursued (3) improper foreclosure lawsuits against the Petersons, given these known servicing errors.

221.    PNC's own employees acknowledge that the Third Foreclosure has no legal and factual basis; yet, it refuses to dismiss the lawsuit.

222.    PNC knew or should have known that its conduct would cause the Petersons to suffer severe emotional and physical distress.

223.    Despite its knowledge, PNC has callously disregarded the Petersons' rights and recklessly (perhaps intentionally) caused the Petersons severe emotional and physical distress.

224.    Because of PNC's outrageous conduct, the Petersons have suffered severe emotional and physical distress and are entitled to damages.

WHEREFORE, Plaintiffs Lori Hildemeyer and Donald Peterson respectfully request judgment in their favor and against Defendant PNC Bank, N.A., for damages, litigation costs, and any further relief deemed just and proper.

## COUNT II AS TO PNC'S CONSTRUCTIVE FRAUD

225.    The Petersons incorporate paragraphs (1)-(213) as if set forth herein.

226.    PNC has confidential or fiduciary relationship and is in a position of trust and confidence with the Petersons.

227.    PNC therefore has certain duties and responsibilities to the Petersons.

228.    PNC has breached these duties and responsibilities.

229.    With respect to servicers like PNC, the Guidelines explain that "the servicer in its handling of [borrower] funds is acting on behalf of, and as a fiduciary for, Fannie Mae and other parties, as their respective interests may appear—and not as a debtor of Fannie Mae." (Guidelines § 202.02, pg. 102-32) (2011).

230.    The Guidelines further state:

> If the servicer takes any action with respect to these funds or assets that is not expressly authorized—such as the withdrawal or retention of mortgage loan payment funds Fannie Mae is due as an offset against any claim the servicer may have against Fannie Mae—the servicer is not only violating the provisions of this Guide and the Lender Contract, but also is violating the rights of any and all other parties that have a beneficial interest in the funds. Such action is therefore prohibited and will be considered a breach of the Lender Contract.

(*Id.*)

231.    PNC is the escrow holder for the Petersons' Mortgage loan, and as the escrow holder, PNC owed a duty to the Petersons concerning their funds.

232.    Upon information and belief, PNC uses Assurant to monitor its borrowers' mortgage loans for hazard and flood insurance.

233.   PNC uses Assurant as its exclusive force-placed hazard and flood insurance provider.

234.   PNC buys force-placed hazard and flood insurance policies from Assurant, and in turn, Assurant provides commissions to PNC.

235.   PNC is the escrow holder for the Petersons' Mortgage loan, and as the escrow holder, PNC owed a duty to the Petersons concerning their funds.

236.   PNC breached its fiduciary duty and/or its duty of trust to the Petersons when it charged for unnecessary and unreasonable force-placed hazard and flood insurance.

237.   In doing so, PNC took on the extra service of paying for the unnecessary and unreasonable force-placed hazard and flood insurance from the Petersons escrow account.

238.   PNC received a greater economic benefit than from a typical mortgage transaction through unearned kickbacks received from Assurant for the force-placed hazard and flood insurance. PNC also received a greater economic benefit than from a typical mortgage transaction because it paid itself an amount from escrow funds that exceeded what it claimed the Petersons owed for an alleged lapse in hazard insurance coverage.

239.   PNC exercised exclusive control over these transactions such as who it chose to buy the hazard and flood insurance from.

240.   PNC also took on the extra service of applying the Petersons' monthly installment payments from a suspense account. PNC breached its fiduciary duty and/or duty of trust to the Petersons when it misapplied and misappropriated the Petersons' funds from the suspense account.

241.   PNC had exclusive control over the funds held in suspense and escrow.

242.     PNC took improper advantage of the exclusive control over the Petersons' funds and the fiduciary and/or trust relationship it had with the Petersons by choosing to charge them for unreasonable and inappropriate force-placed hazard and flood insurance. And also choosing to pay itself more than what the Petersons allegedly owed for the insurance.

243.     PNC also took improper advantage of its exclusive control over the Petersons' funds when it misapplied and misappropriated them from the suspense account it created.

244.     The Petersons were financially harmed as a result of PNC abusing its duties. PNC used this unconscionable advantage to force the Petersons into an alleged default under the Mortgage.

245.     To date, PNC continues to use that unconscionable advantage.

246.     Because of PNC's constructive fraud, the Petersons are entitled to damages.

WHEREFORE, Plaintiffs Lori Hildemeyer and Donald Peterson respectfully request judgment in their favor and against Defendant PNC Bank, N.A., for damages, litigation costs, and any further relief deemed just and proper.

## COUNT III AS TO PNC'S VIOLATION OF THE
## FLORIDA CONSUMER COLLECTION PRACTICES ACT § 559.72(9)

247.     The Petersons incorporate paragraphs (1)-(11); (29)-(213).

248.     The Petersons are "consumers" as defined by Fla. Stat. § 559.55(8) when they purchased their home by mortgage for personal, family or household use.

249.     PNC is a "person" as defined under the FCCPA.

250.     PNC has knowingly charged the Petersons illegitimate default-related fees and costs and it has attempted to collect, and has collected, them from the Petersons.

251.    For instance, the property inspection fees are illegitimate and unreasonable.

252.    Under Fannie Mae's Servicing Guide, a mortgage servicer must "[o]btain property inspections every 30 days until it establishes QRPC as long as the mortgage loan remains 45 days or more." (The Guidelines D2-2-11, Requirements For Performing Property Inspections (11/12/2014), pg. 418).

253.    PNC knew the Petersons lived in and maintained their property and that it achieved quality right party contact with the Petersons.

254.    Yet, PNC continued to order unreasonable property inspections and charge them to the Petersons.

255.    Upon information and belief, PNC also has a relationship with the third-party vendor, Safeguard, that performed the property inspections, and the cost to PNC was much less than the $9 to $15 it charged the Petersons for each inspection.

256.    The illegally inflated property inspection charge allows PNC to keep the difference between what it charged the Petersons and what it actually paid.

257.    PNC has also demanded the Petersons pay the default-related fees and costs from the Second Foreclosure that was dismissed after being filed in error.

258.    PNC knows it has no legal right to demand the Petersons pay these fees because it filed the dismissal for the Second Foreclosure.

259.    PNC's violation of the FCCPA has caused the Petersons out-of-pocket monetary loss. Further, PNC's conduct has harmed the Petersons by depriving them of the statutory right to accurate, clear, and conspicuous information about amounts owed under the Mortgage, and has caused the Petersons severe mental and emotional distress.

260.    Because of PNC's violation of the FCCPA, the Petersons are entitled to actual damages, plus statutory damages under § 559.77(2) of the FCCPA, together with reasonable attorney's fees and costs.

WHEREFORE, Plaintiffs Lori Hildemeyer and Donald Peterson respectfully request judgment in their favor and against Defendant PNC Bank, N.A., for actual and statutory damages, attorneys' fees and litigation costs, and any further relief deemed just and proper.

## COUNT IV AS TO PNC'S VIOLATION OF THE
## FLORIDA CONSUMER COLLECTION PRACTICES ACT § 559.72(18)

261.    The Petersons incorporate paragraphs (1)-(11); (133)-(213) as if fully stated herein.

262.    The Petersons are "consumers" as defined by Fla. Stat. § 559.55(8) when they purchased their home by mortgage for personal, family or household use.

263.    PNC is a "person" as defined under the FCCPA.

264.    PNC communicated directly with the Petersons when it knew the Petersons were represented by counsel related to the alleged debts it sought to collect.

265.    "Communication" means the conveying of information regarding a debt directly or indirectly to any person through any medium. Fla. Stat. § 559.55(2).

266.    Besides leaving brightly colored door hangers on the Petersons property, PNC has engaged in other direct communications with the Petersons in attempt to collect a debt.

267.    For example, on or about November 9, 2016, PNC's third-party vendor, Safeguard, went to the Petersons' home and had direct contact with Mr. Peterson in attempt to collect a debt for PNC. At that time, the Safeguard employee told Mr. Peterson to call PNC.

268.    Further, as recently as May 14, 2018, PNC's servicing notes reveal it called the Petersons' residence in attempt to collect a debt from them.

269.    At all times relevant, PNC had Smothers' name and address. Additionally, at no time did Smothers fail to respond to a communication from PNC, nor did Smothers consent to allow direct communication with the Petersons.

270.    PNC's illegal communications deprived the Petersons of their statutory right to be free from collection activities. PNC's direct communications have also caused the Petersons severe mental and emotional distress.

271.    Due to its FCCPA violation, PNC is liable to the Petersons for actual damages, and statutory damages of up to $1,000.00, together with attorney's fees and costs. *See* § 559.77(2).

WHEREFORE, Plaintiffs Lori Hildemeyer and Donald Peterson respectfully request judgment in their favor and against Defendant PNC Bank, N.A., for actual and statutory damages, attorneys' fees and litigation costs, and any further relief deemed just and proper.

### COUNT V AS TO PNC'S VIOLATION OF THE
### REAL ESTATE SETTLEMENT PROCEDURES ACT 12 U.S.C. § 2605(k)

321.    The Petersons incorporate (1)-(11); (79)-(87); (117)-(213) as if fully set forth herein.

322.    PNC is a "servicer" because it was responsible for "servicing" the Petersons' mortgage loan when it would receive scheduled periodic payments and make payments of principal and interest from those amounts under the terms of the loan. 12 U.S.C. § 2605(i)(3).

323.    The Petersons' loan is a "federally related mortgage loan" because it is secured by a first or subordinate lien on residential real property designed for the occupancy of one to four families and was made in whole or in part by a lender that had deposits or accounts insured by the FDIC. 12 U.S.C. § 2602(1)(A),(B)(i).

324.    As a servicer of a federally related mortgage loan, PNC must comply with any regulation implementing the provisions of RESPA. *See* 12 U.S.C. § 2605(k)(1)(E).

325.    PNC must comply with RESPA's requirements concerning responding to written notices of error and written requests for information from borrowers.

326.    PNC violated 12 CFR § 1024.35(e)(1)(i)-(ii) when it received written notices of error from the Petersons, and in response, PNC performed an unreasonable investigation and failed to correct the errors that occurred on the Petersons' Mortgage loan.

327.    PNC also violated § 1024.35(e)(1)(i)-(ii) when it responded to the Petersons' written notices of error with inaccurate information about the amounts owed under the Mortgage as required by 12 CFR § 1024.32(a)(1). *See* 12 CFR § 1024.38(b)(1)(iii).

328.    PNC violated 12 CFR § 1024.36(d)(1)(i)-(ii) when it received written requests for information from the Petersons and failed to respond with accurate, clear, and conspicuous information. 12 CFR § 1024.32(a)(1), *See* 12 CFR § 1024.38(b)(1)(iii).

329.    PNC has a pattern and practice of violating RESPA as shown by repeatedly failing to comply with RESPA described above.

330.    Because of PNC's violation of RESPA, the Petersons have suffered out-of-pocket monetary loss. PNC's conduct has also harmed the Petersons by depriving them of the statutory right under RESPA to accurate, clear, and conspicuous information about amounts

owed under the Mortgage. Further, PNC has deprived the Petersons of the statutory right under RESPA to have servicing errors fixed by PNC after being placed on notice of the errors.

WHEREFORE, Plaintiffs Lori Hildemeyer and Donald Peterson respectfully request judgment in their favor and against Defendant PNC Bank, N.A., for actual and statutory damages, attorneys' fees and litigation costs, and any further relief deemed just and proper.

## JURY DEMAND

331.     The Petersons are entitled to and respectfully demand a trial by jury on all issues so triable.

## RELIEF REQUESTED

WHEREFORE, the Petersons respectfully request the Court to enter judgment against PNC for all of the following:

a.     Actual damages, including but not limited to forgiveness of all amounts not owed.

b.     Statutory damages.

c.     Costs and attorney's fees.

d.     Injunctive and declaratory relief.

e.     The Court enter an order that PNC and its agents, or anyone acting on its behalf, are immediately restrained from altering, deleting or destroying any documents or records.

f.     And such other and further relief as the Court may deem just and proper.

Dated July 12, 2018,                          Respectfully submitted,


ZEBERSKY PAYNE, LLP                  CONSUMER LAW ORGANIZATION, P.A.
110 S.E. 6th Street, Suite 2150           721 US Highway 1, Suite 201
Fort Lauderdale, FL 33301                 North Palm Beach, Florida 33408
Telephone: (954) 595-6060               Telephone: (561) 822-3446
Facsimile: (954) 989-7781               Facsimile: (305) 574-0132

*/s/Jordan A. Shaw*                        */s/ Darren Newhart*
JORDAN A. SHAW, ESQ.                 J. DENNIS CARD, JR., ESQ.
Fla. Bar No.: 111771                      Fla Bar No.: 0487473
jshaw@zpllp.com                          dennis@cloorg.com
mperez@zpllp.com                         DARREN R. NEWHART, ESQ.
KIMBERLY A. SLAVEN, ESQ.             Fla. Bar No.: 0115546
Fla. Bar No. 117964                       darren@cloorg.com
kslaven@zpllp.com


## CERTIFICATE OF SERVICE

I certify that on this 12th day of July, 2018, a copy of the foregoing was filed via the Court's Electronic Filing system. Notice of this filing will be sent to the parties of record by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.


/s/Jordan A. Shaw
Jordan A.Shaw